THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | | |
|---|---|---|
| TWIN CREST GROUP, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 10-6350 (JS) |
| | : | |
| DELAWARE VALLEY | : | |
| UROLOGY, LLC, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| DELAWARE VALLEY | : | |
| UROLOGY, LLC | : | |
| | : | |
| Third-Party Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| JOSEPH PLANDOWSKI, et al., | : | |
| | : | |
| Third-Party Defendants. | : | |
| | : | |

## OPINION

This matter is before the Court on the "Motion for Partial Summary Judgment" [Doc. No. 69] filed by plaintiff Twin Crest Group ("TCG") and third-party defendants Joseph Plandowski, Bernie Ness, B.J. Ness Consulting, LLC, Lakewood Consulting, LLC, Twin Crest, LLC, and In-Office Pathology, LLC. TCG is seeking partial summary judgment on Delaware Valley Urology's ("DVU") counterclaims for breach of contract, breach of covenant of good faith and fair dealing, and unjust enrichment. The

1

third-party defendants are seeking summary judgment on all of DVU's third-party claims. (Unless otherwise noted, TCG and third-party defendants shall be collectively referred to as "movants"). The Court received DVU's opposition. [Doc. No. 78]. The Court exercises its discretion to decide movants' motion without oral argument. See Fed. R. Civ. P. 78; L. Civ. R. 78.1. For the reasons to be discussed, movants' motion is DENIED.

Background

Since this Order is primarily for the benefit of the parties who are already familiar with the background of this matter, only the most salient facts are set forth herein. DVU is a urology physician practice group serving the Southern New Jersey and Philadelphia area. Am. Third-Party Compl. ¶ 1 [Doc. No. 67]. Prior to judicial dissolution, TCG was a consulting group that provided consulting services to physician practice groups seeking to set up in-office pathology laboratories. Id. at ¶ 2; see Answer to Movants' Statement of Material Facts at ¶¶ 3-4 [Doc. No. 78].[1] On May 23, 2007, the parties entered into an "In-Office Laboratory Agreement" ("Agreement") in which TCG agreed to install a 600 square foot, fully functional in-office

---

[1] On February 22, 2010, the partnership of TCG was judicially dissolved in Ohio's Lucas County Court of Common Pleas. See Cunningham v. Ness, No. CI200806180 (Oh. Ct. C.P. Feb. 22, 2010) (hereinafter referred to as "Dissolution Decree") [Doc. No. 78-1, Ex. 1].

anatomic pathology laboratory within DVU's existing Voorhees, New Jersey facility. Movants' Statement of Material Facts, ¶ 6 [Doc. No. 69-2]. Under the Agreement, TCG was responsible for completing the following work: (1) design, construct, and equip the laboratory; (2) select, order, and install necessary equipment; (3) recruit and recommend medical and technical staff needed to operate the laboratory; (4) assure that "the laboratory [was] inspected by all necessary governmental, professional and other entities and obtain all necessary licenses and permits for construction and . . . assure that the [l]aboratory receive[d] its Clinical Laboratory Improvement Amendment (CLIA) certification prior to processing patient tests"; (5) flowchart specimens and paperwork routing to ensure a smooth workflow; (6) review laboratory operations; (7) recommend a billing services company; and (8) provide a Physician Office Laboratory pathology reporting system. Id. at ¶ 7; see Agreement, Ex. A ¶¶ 1-9 [Doc. No. 78-1].

In consideration for TCG's services, DVU agreed to pay TCG in accordance with the compensation schedule set forth in the Agreement. See Agreement, Ex. C. Specifically, TCG was to be paid "Specimen Fees" for "Covered Procedures" as defined by Schedule C-3 of the Agreement. Id. at C-3; see Answer to Movants' Statement of Material Facts, ¶ 8-9. The Agreement also

prescribed the manner in which DVU was "entitled" to terminate the contract in the event of a breach by TCG, providing:

> Any breach by TCG of this Agreement shall be actionable by DVU. DVU shall be entitled to terminate this Agreement upon 10 days notice for any breach not cured within such 10 day period, may sue for damages and may withhold and set off against such damages any amount owing by it to TCG.

Agreement at 3, ¶ 18.[2] Subsequently, on January 31, 2009, counsel for DVU notified Bernie Ness, then Vice President of TCG, that DVU was exercising its right to terminate the Agreement based upon TCG's alleged material breach. Movants' Statement of Material Facts, ¶ 11; see also Termination Email [Doc. No. 69-8]. DVU's counsel specified that TCG had "materially breached the Agreement by its failure to obtain the required CLIA licenses and certifications for DVU's Voorhees Laboratory." See Termination Email.

TCG filed the instant action against DVU on December 8, 2010, asserting claims for breach of contract, promissory estoppel,

---

[2] The Agreement included specific requirements to effectuate notice

> Any notice required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, delivered, or mailed by certified or registered mail, postage prepaid, or sent by national recognized overnight courier to the parties at the addresses set forth [in the Agreement] or at such other address as a party shall designate by notice to the other . . . .

Agreement at 2, ¶ 12.

unjust enrichment, and breach of good faith and fair dealing.
See generally Complaint [Doc. No. 1]. TCG alleges that DVU
wrongfully terminated the Agreement and refused to remit
payments owed to TCG for performing its obligations under the
contract. See id. at ¶¶ 15-18. In response, DVU denies breaching
the contract, arguing that it exercised its contractual right to
terminate the Agreement in light of TCG's "fail[ure] to timely
construct [DVU]'s Laboratory . . . fail[ure] to obtain necessary
building permits to construct [DVU's lab] . . . fail[ure] to
obtain the necessary Clinical Laboratory Improvement Amendment
license certifications for [DVU] to operate its laboratory . . .
fail[ure] to oversee and ensure preparation or all necessary
laboratory manuals and specimen processing practices . . . [and]
fail[ure] to perform monthly inspections of the Laboratory as
required by the Agreement." Am. Answer, ¶ 8 [Doc. No. 66].[3] In
addition, DVU asserts six counterclaims against TCG.[4]

_____

[3] On January 28, 2011, DVU filed its initial answer and
counterclaims against TCG. [Doc. No. 8]. On March 5, 2013, this
Court granted DVU's motion for leave to file an amended answer,
amended counterclaims, and an amended third-party complaint. See
March 5, 2013 Order [Doc. No. 65]. DVU subsequently filed its
amended answer and amended counterclaims [Doc. No. 66] against
TCG, as well at its amended third-party complaint against third-
party defendants. [Doc. No. 67].

[4] DVU asserts the following counterclaims against TCG: fraud in
the inducement, negligent misrepresentation, breach of contract,
breach of covenant of good faith and fair dealing, unjust
enrichment, and a violation of the New Jersey Consumer Fraud Act

DVU filed its initial third-party complaint on January 28, 2011, against third-party defendants, a group comprised of partners and/or successor entities of TCG asserting the following claims: fraud in the inducement, negligent misrepresentation, breach of contract, breach of covenant of good faith and fair dealing, unjust enrichment, tortious interference with contract, and a violation of the New Jersey Consumer Fraud Act pursuant to N.J. Stat. Ann. § 56:8-1 et seq. See generally Third-Party Compl. [Doc. No. 9]. DVU's third-party complaint was later amended to include allegations that TCG failed to perform monthly inspections of the lab as required by the Agreement and committed "unconscionable commercial practices" by representing that it would continue to service DVU despite having no intention to do so. See Am. Third-Party Compl., ¶¶ 15, 55-56.

In sum and substance, DVU alleges that third-party defendants intentionally misrepresented their background, experience and ability to construct, operate, design, and license DVU's pathology lab which ultimately led to DVU being cited for various deficiencies and the need for corrective action. Id. at ¶ 8. DVU claims that under the Agreement, the laboratory was to be "designed, built, equipped, and CLIA

---

pursuant to N.J. Stat. Ann. § 56:8-1 et seq. See generally Am. Answer and Counterclaim.

licensed" within ninety (90) days, meaning the project was to be fully completed by August 23, 2007. Supplemental Counterstatement of Material Facts, ¶ 32 [Doc. No. 78].[5] DVU accuses TCG of hiring "unqualified" subcontractors, whose lack of experience and expertise led to defective work, problems and delays in the completion of the laboratory. Id. at ¶¶ 41-46.

DVU also accuses TCG of breaching the Agreement by failing to obtain the proper certification under the Clinical Laboratory Improvement Amendments of 1988 ("CLIA") (42 U.S.C. § 263a), which is required to operate DVU's laboratory. Id. at ¶¶ 48-50. DVU claims that after operating its facility for eight months, it discovered that its CLIA certification was invalid. Id. at ¶ 51. As a result, DVU was unable to retroactively recover lost Medicare payments that were denied because of the invalid CLIA license. Id. at ¶ 52. DVU also claims to have suffered damages as a result of its inability to perform additional lab procedures while waiting to receive a proper CLIA certification. Id. at ¶ 53.[6]

---

[5] The Court notes that movants did not respond to DVU's Supplemental Counterstatement of Material Facts as required pursuant to L. Civ. R. 56.1(a).

[6] Given that TCG does not seek the dismissal of DVU's counterclaims for violations of the New Jersey Consumer Fraud Act, fraud in the inducement, negligent misrepresentation, and tortious interference with contract, the Court will only address DVU's counterclaims for breach of contract, breach of covenant of good faith and fair dealing, and unjust enrichment.

In the present motion, movants seek partial summary judgment in favor of TCG on DVU's counterclaims for breach of contract, breach of covenant of good faith and fair dealing, and unjust enrichment. Movants also seek partial summary judgment on all of DVU's third-party claims.[7] The gravamen of movants' argument as to the contract claims is that under the Agreement, DVU was required to provide written "notice to [TCG] and the opportunity to cure any alleged default before it [could] sue for damages." Brief at 6; <u>see</u> Agreement at 2-3, ¶¶ 12, 18. Movants argue that the "notice provision was clearly a condition precedent to DVU's right to bring a lawsuit for any alleged breach." Brief at 7. Movants rely heavily on the deposition testimony of Nancy Romeo, DVU's chief operating officer, to show that TCG was never notified of its alleged breach or given an opportunity to fix any such breach. <u>Id.</u>; <u>see</u> Romeo Dep. ¶¶ 79:5-12, 80-81:13-2 [Doc. No. 69-7]. Furthermore, movants argue that DVU's claims against third-party defendants should be dismissed as a matter of law because they were not parties to the Agreement and thus cannot be held individually liable for actions taken on behalf of TCG. Brief at 7-9.

---

[7] On June 21, 2013, the Honorable Jerome B. Simandle entered an order approving the stipulation of the parties to voluntarily dismiss the third-party complaint against Douglas Cunningham. [Doc. No. 71].

In its opposition, DVU contends that "it did, in fact, provide [TCG] written notice of its breach of the Agreement, but [TCG] failed to provide any assistance" in fixing the problems arising out of the invalid CLIA certification. Brief at 1. DVU argues that TCG was not only notified of its failure to acquire a valid CLIA license in an email sent by Ms. Romeo to Bernie Ness on November 17, 2008, but it also refused to assist DVU in correcting the CLIA problems or perform any work for DVU due to TCG's internal partnership dispute. Id. at 5, 15; see November 17, 2008 Email [Doc. No. 78-1, Ex. 5]. To support its claims, DVU cites to the following exchange in Mr. Ness' deposition testimony:

> Question: The email is dated November 17th. My question is, after that, did you provide any assistance [on the CLIA issue]?
>
> Answer (Ness): No.

Supplemental Counterstatement of Material Facts, ¶ 58; see Ness Dep. ¶¶ 429-30:23-4 [Doc. No. 78-1, Ex. 6]. In explaining the nature of its business relationship with TCG, DVU claims that it "could no longer reasonably trust that [TCG] was capable of overseeing compliance, billing, and operations of the [l]aboratory." Id. at ¶ 59.

DVU argues that "the termination provision in the Agreement is not the exclusive remedy for terminating the Agreement." Brief at 2. DVU contests movants' interpretation of the notice

and cure provision, arguing that the "provision applies *only* to terminating the Agreement, <u>not</u> suing [TCG] for damages." Brief at 6 (emphasis in original). From DVU's perspective, the provision provided two independent remedies: "(1) to terminate the Agreement upon notice and an opportunity to cure and/or (2) to sue for damages." <u>Id.</u> As such, DVU argues that it was not required to provide TCG with notice of its breach or an opportunity to cure before exercising its right to sue for damages. <u>Id.</u> at 7. DVU asserts that "notwithstanding that the notice and opportunity to cure provision applies *only* to terminating the [A]greement, DVU had the right to terminate the Agreement and to sue [TCG] for damages without providing any written notice and an opportunity to cure because TCG materially breached the Agreement." <u>Id.</u> In other words, the provision "did not abrogate or diminish DVU's common law right" to terminate for material breach. <u>Id.</u>

Alternatively, DVU argues that even if it were required to give TCG written notice of breach and an opportunity to cure, doing so would have been a "futile act" given the materiality and circumstances surrounding TCG's alleged breach. <u>Id.</u> at 13. DVU explains that because laboratories must be properly certified in order to receive Medicare or Medicaid payments, there was no way for TCG to "go back in time to cure its breach by acquiring a valid CLIA 'prior to [DVU] processing patient

tests.'" Id. at 12-13. DVU argues that there was no way to recover the "lost reimbursements for the procedures that [DVU] performed and Medicare rejected and . . . the lost profits for the time DVU was required to close its [l]aboratory." Id. In further support of its argument that providing notice of breach and an opportunity to cure would have been a "useless gesture," DVU attributes TCG's refusal to perform services to an alleged internal partnership dispute amongst TCG's principals. Id. at 19. DVU submits that TCG's alleged breach and refusal to perform services under the Agreement provided DVU with "absolute justification" for terminating the Agreement. Id.

With respect to movants' argument that third-party defendants are immune from liability because they were not parties to the Agreement, DVU cites to the Dissolution Decree in arguing that "[Bernie] Ness, [B.J.] Ness Consulting, [Joseph] Plandowski, and Lakewood Consulting are liable for all liabilities associated with the Agreement." Id. at 21 (citing to Dissolution Decree at 5, ¶ 4:e-f). The Dissolution Decree provides in pertinent part:

> As set forth in the Settlement Agreement, the assets and liabilities of the Partnership shall be distributed in liquidation of the Partnership as follows:
>
> - Cunningham shall assume all of the duties and liabilities associated with the [Consultants in Gastroenterology] Contract

and [Desert Gastroenterology Consultants]
            Contract.

        •   Ness/Ness Consulting and
            Plandowski/Lakewood Consulting, are
            assigned all other Partnership contracts
            ("Remaining Contracts") effective December
            31, 2009. The assignment includes all
            assets and liabilities associated with the
            Remaining Contracts.

        •   Ness/Ness Consulting and
            Plandowski/Lakewood Consulting shall
            assume all of the duties and liabilities
            associated with the Remaining Contracts [8]

Id. (emphasis omitted). Furthermore, DVU contends that both In-

Office Pathology and Twin Crest LLC are subject to liability as

successor companies to TCG. Id. at 22.

        For the reasons to be discussed, movants' motion is denied.

As to DVU's contract counterclaims, the Court finds that DVU's

right to sue for damages was not contingent upon first providing

TCG with notice of TCG's alleged breach and an opportunity to

cure. Moreover, assuming arguendo that the provision imposed

such an obligation, a question of fact exists as to whether

DVU's adherence to such a provision was excused in light of

TCG's alleged material and irreparable breach, and whether it

would have been futile to give notice. The Court also finds that

DVU has raised a fact question as to whether DVU put TCG on

---

[8] It is undisputed by the parties that the "Remaining Contracts"
assigned to Mr. Ness, Mr. Plandowski, B.J. Ness Consulting, and
Lakewood Consulting in the Dissolution Decree includes the
Agreement at issue in this case.

notice of its material breach in a November 17, 2008 email
exchange discussing TCG's failure to acquire a valid CLIA
license.

As to DVU's third-party claims, TCG's status as a general
partnership, rather than a limited liability corporation, allows
for the imposition of joint-liability on third party-defendants
Joseph Plandowski, Bernie Ness, B.J. Ness Consulting, and
Lakewood Consulting for TCG's remaining contractual debts and
obligations. As a general partner and/or successor in interest
to TCG, third-party defendant Twin Crest LLC is potentially
liable for the debts and obligations stemming from the
Agreement. Consequently, as the successor to Twin Crest LLC,
third-party defendant In-Office Pathology is also potentially
liable for the debts and obligations arising out of the
Agreement. Therefore, movants' motion for partial summary
judgment is denied.

Discussion

Pursuant to Fed. R. Civ. P. 56, summary judgment is
appropriate where the Court is satisfied that "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any . . . demonstrate the
absence of a genuine issue of material fact." Celotex Corp. v.
Catrett, 477 U.S. 317, 323 (1986). Summary judgment will not lie
if the dispute about a material fact is "genuine," that is, if

the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The materiality of a fact turns on whether under the governing substantive law, a dispute over the fact might have an effect on the outcome of the suit. Id.; see Red Roof Franchising, LLC v. Patel, 877 F. Supp. 2d 124, 129-30 (D.N.J. 2012). A court must draw all reasonable inferences from the underlying facts in the light most favorable to the non-moving party when considering a motion for summary judgment. See Emerson Radio Corp. v. Orion Sales, Inc., 253 F.3d 159, 162 (3d Cir. 2001).

The moving party bears the initial burden of informing the court of the basis for its motion and demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. Once the burden is met, the burden shifts to the non-moving party to "set forth specific facts showing that there [are] . . . genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. The party opposing summary judgment may not "rest upon mere allegation or denials of his pleading," but must set forth specific facts and present affirmative evidence demonstrating that there is a genuine issue for trial. Id. at 256-57; see also Red Roof, 877 F. Supp. 2d at 130.

14

1. <u>Counterclaim</u>

Movants' motion is predicated upon the following two facts being undisputed: (1) the notice and cure provision required DVU to provide TCG with written notice of breach and ten days to cure before DVU was entitled to sue for damages; and (2) DVU did not provide TCG with notice and an opportunity to cure its alleged breach.

With respect to movants' assertion that the Agreement required DVU to provide TCG with notice of TCG's alleged breach and an opportunity to cure before suing for damages, DVU argues that the Agreement imposed no such obligation. Brief at 6. In light of the parties' conflicting interpretations of the notice and cure provision, the Court must determine whether the relevant terms of the contract are susceptible to more than one meaning. <u>Reed Elsevier, Inc. v. Inherent.com, Inc.</u>, No. 05-4048 (JLL), 2006 WL 3827414, at **1, 5 (D.N.J. Dec. 27, 2006) ("It is hornbook law that if the relevant terms in a contract are ambiguous, the issue must go to a jury.") (internal citations omitted).

A court "can grant summary judgment on an issue of contract interpretation if the contractual language being interpreted is subject to only one reasonable interpretation." <u>Id.</u>; <u>see also</u> <u>Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.</u>, 180 F.3d 518, 524 (3d Cir. 1999) (finding that the trial court erred in

granting summary judgment for defendants because plaintiff provided a reasonable alternative reading of the assignment clause in dispute). If the terms of a contract are clear and unambiguous "there is no room for interpretation or construction and the courts must enforce those terms as written." <u>Travelodge Hotels, Inc. v. Elkins Motel Assocs., Inc.</u>, No. 03-799 (WHW), 2005 WL 2656676, at **1, 4 (D.N.J. Oct. 18, 2005) ("Whether a contract provision or term is clear or ambiguous is a question of law and therefore suitable for a decision on a motion for summary judgment."). In deciding whether a contract is ambiguous, courts must "consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation." <u>Teamster Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc.</u>, 989 F.2d 132, 135 (3d Cir. 1991) ("To decide whether a contract is ambiguous, we do not simply determine whether, from our point of view, the language is clear. Rather, we 'hear the proffer of the parties and determine if there are objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible to different meanings.'") (internal citations omitted); <u>see</u> <u>also</u> <u>Emerson</u>, 253 F.3d at 164. Where the parties "do not dispute the contents of the writings but disagree on the document's legal effect there are no genuine issues of material fact." <u>FPM Financial Services, LLC v. Redline</u>

Products, Ltd., No. 10-6118 (LHG), 2013 WL 5288005, at **1, 2 (D.N.J. Sept. 17, 2013) (quoting CECG, Inc. v. Magic Software Enter., Inc., 51 Fed. Appx. 359, 363 (3d Cir. 2002)).

The parties do not deny the existence of a valid contract. Rather, the parties adopt conflicting views over whether the language outlining the obligation to provide notice of breach and an opportunity to cure applies to DVU's right to sue for damages. After reviewing the Agreement's language and considering the parties' suggested interpretations, the Court finds that DVU's right to sue for damages was not contingent upon first providing TCG with notice of its breach and an opportunity to cure. In the Court's view, DVU's obligation to give notice and an opportunity to cure applied only to DVU's right to terminate, not its right to sue for damages. A reading of the provision's first sentence, which provides that "[a]ny breach by TCG of this Agreement shall be actionable by DVU," illustrates the broad latitude afforded to DVU in seeking legal redress for TCG's deficient performance. See Agreement at 3, ¶ 18. While the first clause of the provision's second sentence limits DVU's right to terminate "upon 10 days notice for any breach not cured within such 10 day period," the second clause of the same sentence independently provides that DVU "may sue for damages and may withhold and set off against such damages any amount owing by it to TCG." Id. While neither party has

provided the Court with extrinsic evidence explaining why the provision was drafted in this manner, in light of the broad authority afforded to DVU in bringing actions for "any breach by TCG," it is unlikely that the parties intended to limit DVU's common law right to sue for a material breach. Similarly, the Court finds that a provision contractually obligating DVU to notify TCG of a material breach that could not be cured within the prescribed ten day period would be counterintuitive and serve no benefit to the parties. Under the terms of the Agreement, DVU's right to sue for damages was available as an independent remedy separate from its expressly granted right to terminate the Agreement. The Court interprets the Agreement as providing that DVU retained its right to sue for damages based upon a material breach, even if it did not first give TCG notice and an opportunity to cure.[9]

However, even if the Agreement did require DVU to provide TCG with notice and an opportunity to cure its alleged breach before suing for damages, the Court finds that a question of fact exists as to whether Ms. Romeo's November 17, 2008 email to Mr. Ness discussing potential costs stemming from the invalid

---

[9] Movants also request partial summary judgment on DVU's counterclaims for breach of covenant of good faith and fair dealing and unjust enrichment. These arguments stem from the same assertion that DVU was required to provide notice of breach and an opportunity to cure before suing for damages. In finding that the provision does not impose such an obligation, movants' request with respect to these claims is also denied.

CLIA license constituted notice. See November 17, 2008 Email.

While DVU does not contend that Ms. Romeo's email complied with

the specific notice requirements set forth in the Agreement [see

Agreement at 3, ¶ 12], a fact-finder could determine that the

content and substance of the email exchanges between Ms. Romeo

and Mr. Ness concerning the status of the CLIA license was

sufficient to put TCG on notice of its material breach. As such,

the Court finds that the factual issues raised by Ms. Romeo's

email that purportedly provided TCG with notice of its breach

precludes summary judgment in favor of the movants. See Ryan v.

Henderson, 533 A.2d 70, 73 (N.J. Super. Ct. Law Div. 1986)

(finding genuine issue of material fact existed as to whether

insurance company provided insured with adequate notice of

intent to cancel coverage policy).

There are other questions of material fact that preclude

summary judgment in movants' favor. One is whether TCG's actions

constituted a material breach of the Agreement, thereby

justifying DVU's termination of the contract. A "breach of

contract and termination are two very different concepts." In re

Nickels Midway Pier, LLC v. Wild Waves, LLC, 372 B.R. 218, 222

(D.N.J. 2007). While a "breach of contract gives rise to a claim

for damages by the non-breaching party . . . [t]ermination, on

the other hand, causes the contract to cease existing." Id. at

222-23 ("A material breach of contract on the part of one party

entitles the other party to terminate it. If the breach is
material . . . the non-breaching party may treat the contract as
terminated and refuse to render continued performance.")
(citation omitted). Courts have described a material breach as
follows:

> Where a contract calls for a series of acts over a
> long term, a material breach may arise upon a single
> occurrence or consistent recurrences which tend to
> defeat the purpose of the contract. In applying the
> test of materiality to such contracts a court should
> evaluate 'the ratio quantitatively which the breach
> bears to the contract as a whole, and secondly the
> degree of probability or improbability that such a
> breach will be repeated.'

Magnet Resources, Inc. v. Summit MRI, Inc., 723 A.2d 976, 981

(N.J. Super. Ct. App. Div. 1998) (citing Medivox Productions,

Inc. v. Hoffman LaRoche, Inc., 256 A.2d 803, 809 (N.J. Super.

Ct. Law Div. 1969)). The New Jersey Supreme Court has explained:

> The fact that the defendant has been guilty of
> substantial breaches of essential obligations under
> the contract would ordinarily give the plaintiff the
> right to deem itself discharged from further
> performance and to sue the defendant for damages under
> the contract. But this is not always the injured
> party's only course of action. In a case of a
> 'material breach of contract which does not, however,
> indicate any intention to renounce or repudiate the
> remainder of the contract the injured party has a
> genuine election offered him of continuing performance
> or of ceasing to perform, and any action indicating an
> intention to perform will operate as a conclusive
> choice, not indeed depriving him of a right of action
> for the breach which has already taken place, but
> depriving him of any excuse for ceasing performance on
> his own part.'

<u>Frank Stamato & Co. v. Borough of Lodi</u>, 71 A.2d 336, 339 (N.J.
1950) (citation omitted). Guided by these principles of contract
law, the Court finds that even if DVU's right to sue for damages
was contingent upon first providing TCG with notice and an
opportunity to cure, there is a fact question as to whether
TCG's alleged breach justified DVU's termination of the
Agreement.

Another fact question is whether TCG was capable of fixing
the problems caused by the invalid CLIA certification,
particularly the lost Medicare reimbursements. There is a fact
question as to whether it was futile to allow TCG, an internally
feuding partnership with a record of substandard performance
under the Agreement, to fix the CLIA licensing problems that
already resulted in months worth of denied payments. Brief at
15. The following excerpt from Ms. Romeo's deposition sheds
light on the rationale underlying DVU's decision not to provide
TCG with an opportunity to cure its alleged breach:

> Question: Did anybody either you or anyone on behalf
> of [DVU], give [TCG] an opportunity to cure any
> breaches?
>
> Answer [Ms. Romeo]: I don't – I think that at that
> point we realized [Ness] couldn't live up to his
> obligation. [Ness] already failed us. We weren't going
> to take any chances. We already corrected the problem.
> The CLIA was corrected by us. What was [Ness] going to
> cure? There was no reason to think [Ness] would – it
> was already taken care of.

Romeo Dep. ¶ 80:13-22. The deposition continues:

> Question: When the CLIA issue arose, why didn't
> somebody call Bernie [Ness] to tell him that you
> messed up, you got to fix this?

> Answer [Ms. Romeo]: We had multiple conversations
> about the problems we were having. But at this point
> there was no way we were going to trust [Ness]. [Ness]
> had already messed up pretty badly and we weren't
> going to allow [Ness] to do anything more. We had to
> directly work with the state to try to get [the
> problem] rectified.

Id. at ¶ 81:3-12. Through the deposition testimony of Ms. Romeo,

DVU has shown that it sustained substantial financial harm after

being forced to close its laboratory due to the invalid CLIA

license. Brief at 12-13; Romeo Dep. ¶¶ 56:2-19, 60-61:8-5. Ms.

Romeo explained that DVU first started to notice that some of

its reimbursements were being denied in July of 2008, and by

September of the same year, all charges were being denied. Id.

at ¶ 56:2-19. According to Ms. Romeo, DVU's reimbursements were

being denied by Medicare because the laboratory was performing

"professional and technical" services that required a "complex"

CLIA license, rather than the "waived CLIA license" TCG obtained

on DVU's behalf. Id. at ¶ 64:2-9. Furthermore, Ms. Romeo claims

that DVU is unable to retroactively recover the reimbursements

that were denied due to the invalid CLIA license. Id. at ¶¶ 64-

65:15-12. Given the numerous delays and problems allegedly

caused by TCG's deficient performance under the Agreement, the

Court finds that there is a fact issue as to whether it would have been futile to provide TCG with notice.

In support of its argument that providing notice to TCG would have been futile given the irreparable damage caused by TCG's failure to obtain a valid CLIA certification, DVU cites to Young Traveler's Day Camps, Inc. v. Felson, 287 A.2d 231, 237 (Essex County Ct. 1972). In Felson, the plaintiff entered into a franchise agreement with the defendant, granting the defendant licenses to establish children's summer day camps. Id. at 232. The franchise agreement set forth the defendant's payment obligations and performance expectations, and included a termination clause that permitted the plaintiff, upon written notice, to terminate the contract if the defendant failed to pay the plaintiff a minimum amount of profit. In addition, the contract contained a notice of default provision which provided:

> If the Licensee shall become in default. . . in the performance of any covenant or agreement made hereunder . . . and such default shall not be remedied to the Licensor's satisfaction within five (5) days after notice of such default, then the Licensor may thereupon terminate this Agreement and all rights hereunder of the Licensee, but such termination shall not affect the obligations of the Licensee to take action or to abstain from taking action after termination hereof, in accordance with this Agreement.

Id. at 233. The plaintiff later sued the defendant after he failed to fulfill his contractual obligations and refused to deliver camper contracts that were "vital" to the plaintiff's

preparation for the upcoming camping season. Id. at 233-34.
After the plaintiff won a favorable judgment at trial, the
defendant moved for a new trial, arguing that "material breach
or no, the law is that where a contract contains a provision
such as that quoted [in the franchise agreement], the only
method of terminating is by the notice required under such
provisions." Id. at 235. The court considered whether the notice
of default provision served as an exclusive or cumulative means
of terminating the contract, finding that the issue presented "a
fact question as to whether the notice provision prevented a
party from terminating" for material breach. Id. at 237. In
denying the defendant's motion, the court concluded that the
defendant's failure to deliver the camper contracts constituted
a "breach [that] was not merely material, it was irreparable;
[because] the campers which had not been obtained by the
beginning of July could not be supplied thereafter." Id.

Here, the Court concludes that a question of fact exists as
to whether TCG's failure to obtain a valid CLIA license
constituted an "irreparable" breach of the Agreement, thereby
rendering notice futile. The resolution of this question goes to
the heart of the parties' dispute: whether TCG's material and
alleged incurable breach excused DVU's adherence to the notice
and cure provision. The Court finds that reasonable minds could
conclude that TCG's obligation to obtain a valid CLIA license

was so "vital" to the operation of DVU's laboratory that it went to the "essence" of the Agreement. Id. at 235.

In their motion, movants make no attempt to refute DVU's claims that TCG breached the Agreement by failing to obtain a proper CLIA license, nor do they affirmatively contest the allegations that TCG's partners misrepresented their ability to construct the lab in a timely and professional manner. Movants noticeably omit any reference to the allegedly invalid CLIA license and only summarily note that TCG "performed its contractual obligations pursuant to the [A]greement." Brief at 2. TCG's request for partial summary judgment hinges on whether DVU was contractually obligated to provide TCG with notice of breach and an opportunity to cure. Given the Court's interpretation of the disputed provision, TCG's motion is denied.

2. Third-Party Claims

The Court finds that the arguments set forth in the motion filed by third-party defendants Joseph Plandowski, Bernie Ness, B.J. Ness Consulting, Lakewood Consulting, In-Office Pathology, and Twin Crest LLC are without merit. See Brief at 7-9.[10] In answering the third-party complaint, third-party defendants

_____

[10] While movants seek to dismiss all of DVU's third-party claims, movants omit any reference to Twin Crest LLC when arguing that third-party defendants are immune from liability because they were not parties to the Agreement. See Brief at 7. The Court assumes this was an inadvertent error.

admit that Mr. Plandowski, Mr. Ness, B.J. Ness Consulting,
Lakewood Consulting, and Twin Crest LLC are jointly and
severally liable for the debts, acts, and omissions of TCG as
general partners and/or successors to TCG. See Answer to Third-
Party Compl. ¶¶ 11-15, 18 [Doc. Nos. 27, 28]. Furthermore,
third-party defendants concede that In-Office Pathology is the
successor to Twin Crest LLC. Id. at ¶ 17. Mr. Ness' deposition
testimony also provides insight into the relationship between
the partnership and/or successor entities of TCG by outlining
the manner in which client fees from TCG's "remaining contracts"
were distributed amongst third-party defendants following
judicial dissolution. According to Mr. Ness, he and Mr.
Plandowski "had In-Office Pathology set up at the time of the
dissolution of the partnership, and in reality . . . all of the
additional clients that were left in the partnership were
basically assumed by [Plandowski] and [Ness] . . . ." Ness Dep.
¶¶ 44-45:23-3. Rather than requiring TCG's remaining clients to
sign new contracts with In-Office Pathology, Ness and Plandowski
decided to "let them continue their contracts until they were
terminated." Id. at ¶ 45:14-18. To account for the money they
were receiving from TCG's remaining clients, Plandowski and Ness
set up another company doing business as TCG called Physician
Pathology Laboratories ("PPL"). Id. at ¶¶ 45-46:21-20. Mr. Ness
explained that both he and Plandowski are entitled to the funds

26

received by PPL, as PPL is comprised of third-party defendants
B.J. Ness Consulting and Lakewood Consulting. Id. at ¶ 46:18-20.
Mr. Ness further testified that money is distributed into In-
Office Pathology "for [legal] cases like this one." Id. at ¶
46:4-12.

As part of the dissolution of TCG's partnership, Ohio's
Court of Common Pleas assigned to Mr. Ness, B.J. Ness
Consulting, Mr. Plandowski, and Lakewood Consulting all assets,
duties and liabilities arising out of the partnership's
"Remaining Contracts," which includes the Agreement with DVU.
See Dissolution Decree at ¶ 5. Furthermore, the Ohio Court of
Common Pleas concluded that TCG's founding partners "[Douglas]
Cunningham, [Bernie] Ness or Ness Consulting, and [Joseph]
Plandowski or Lakewood Consulting . . . did not execute a
written agreement formalizing their relationship; thus, the
business relationship between the [p]artners was governed by the
Ohio Uniform Partnership Law ("OUPL")(R.C. §§ 1775.01, et seq.)
. . . ." Dissolution Decree at ¶ 2.[11]

At a minimum, the partners of TCG can be held jointly
liable for the ordinary debts of the partnership. See PNC Bank
v. Farinacci, 964 N.E.2d 1124, 1126 (Ohio Ct. App. 2011).[12]

---

[11] In 2010, the OUPL was repealed and replaced by the Ohio
Uniform Partnership Act ("OUPA") (Ohio Rev. Code Ann. § 1776.01
et seq.).

Although TCG was registered as a limited liability company at the time the Agreement was signed [See Articles of Organization, Doc. No. 69-4, Ex. A], the Ohio Court of Common Pleas subsequently found that TCG operated as a general partnership, not a corporation or a limited partnership. See Dissolution Decree, Conclusions of Law at ¶ 1. Thus, the Court finds that the cases relied upon by third-party defendants in support of the proposition that corporate officers cannot be held liable for actions taken on behalf of a corporation are inapposite given TCG's status as a general partnership.

As partners and/or successors to the general partnership of TCG, Mr. Ness, B.J. Ness Consulting, Mr. Plandowski, Lakewood Consulting, and Twin Crest LLC can be held jointly liable for the partnership's contractual debts and obligations. Moreover, as the successor to Twin Crest LLC, In-Office Pathology can also be held liable for the debts and obligations arising out of TCG's remaining contracts, including the Agreement. Movants have failed to provide evidence establishing TCG's status as a limited partnership or a corporation. Therefore, since TCG was a general partnership, the Court denies movants' motion requesting the Court to immunize the third-party defendants from liability

---

[12] The Court expresses no opinion as to whether TCG's partners can be held jointly and severally liable.

arising out of TCG's Agreement with DVU.[13]

Conclusion

In sum, the Court denies TCG's request for partial summary judgment because the Agreement did not require DVU to give TCG notice and an opportunity to cure before it sued for breach of contract damages. In the alternative, even if DVU was required to give notice, which is not the case, TCG's motion would be denied because there are fact questions as to whether: (1) DVU gave notice to TCG through Ms. Romeo's November 17, 2008 email to Mr. Ness; (2) TCG materially breached the Agreement to an extent justifying DVU's termination of the contract; (3) notice would have been futile given the irreparable damage caused by the invalid CLIA certification; and (4) notice would have been futile given TCG's alleged unwillingness to assist in fixing the CLIA certification problem.

With respect to movants' request for partial summary judgment on all of DVU's third-party claims, the motion is denied because all of the third-party defendants, except for In-Office Pathology, can be held jointly liable as general partners and/or successors to TCG. As a successor to Twin Crest LLC, In-Office Pathology can also be held liable for the debts and

---

[13] In light of the Court's denial of movants' motion for the reasons already discussed, the Court need not address DVU's argument concerning the imposition of tort liability on Mr. Ness and Mr. Plandowski under New Jersey's "participation theory." See Brief at 23.

obligations arising out of TCG's remaining contracts. In addition, Mr. Ness, B.J. Ness Consulting, Mr. Plandowski, and Lakewood Consulting were assigned TCG's liabilities by Ohio's Court of Common Pleas.

Accordingly, for all the foregoing reasons, the motion for partial summary judgment filed by TCG and third-party defendants is DENIED. Since DVU did not file a cross-motion for summary judgment, the Court is merely denying movants' motion and not entering judgment in favor of DVU. An appropriate order will be entered.

s/ Joel Schneider
Joel Schneider
UNITED STATES MAGISTRATE JUDGE


Dated: December 12, 2013